UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X
COSMOPOLITAN SHIPPING CO., INC.,               :
                           Plaintiff,     :
                                        :            18 Civ. 3167 (LGS)
           -against-               :
                                        :            <u>FINDINGS OF FACT</u>
CONTINENTAL INSURANCE COMPANY,        :            <u>AND CONCLUSIONS OF</u>
                          Defendant.     :            <u>LAW</u>
------------------------------------------------------------- X

LORNA G. SCHOFIELD, District Judge:

       This is an insurance coverage dispute between Plaintiff Cosmopolitan Shipping Co., Inc.,

("Cosmopolitan") and Defendant Continental Insurance Company ("CIC") that stems from

claims made against Cosmopolitan by seamen, exposed to asbestos, who sailed on its ships in the

1940s.  Cosmopolitan seeks coverage under an insurance policy that, apart from three

endorsements, cannot be found.  The Court conducted an evidentiary hearing to resolve whether

the policy identified by Cosmopolitan provides it coverage and, if so, the terms of that coverage.

The Court has carefully reviewed the parties' prehearing submissions, the transcript of the

hearing, the hearing exhibits, and the parties' post-hearing submissions.  In addition, the Court

has made credibility determinations based, inter alia, on its observation of each witness's

demeanor and the consistency and logic of the witness's accounts.  Based on all of this, the Court

now issues its findings of fact and conclusions of law pursuant to Federal Rule of Civil

Procedure 52.  For the reasons that follow, the Court finds that Cosmopolitan has met its burden

of showing that at least some of these seamen were covered by CIC's Protection & Indemnity

("P&I") Policy No. C-4893 ("Policy C-4893"), but Cosmopolitan has not met its burden of

showing all the material terms of the policy.

## I.       BACKGROUND

Cosmopolitan is a shipping company that operated cargo, bulk and passenger vessels that it owned or chartered from the U.S. government.  CIC is an insurance company that wrote, inter alia, maritime P&I insurance.

In the mid-1980s, former seamen filed lawsuits against ship owners and operators, including Cosmopolitan, alleging injury from exposure to asbestos.  In September 2017, Cosmopolitan settled forty-seven marine asbestos complaints for injuries sustained by seamen who had sailed aboard war-built vessels chartered by Cosmopolitan between May 1946 and December 1948 ("Relevant Time Period"), by agreeing to the entry of a Consent Judgment in the amount of $4,582,500.  Cosmopolitan seeks coverage with respect to these claims, alleging that CIC insured Cosmopolitan's chartered vessels during the Relevant Time Period.

Cosmopolitan asserts that it is entitled to insurance coverage for all claims by the asbestos plaintiffs who sailed on Cosmopolitan chartered vessels under Policy C-4893 issued by CIC to the United Nations Relief and Rehabilitation Administration ("UNRRA"), the sole policy Cosmopolitan relies upon for coverage.  Cosmopolitan contends that Cosmopolitan chartered these vessels on behalf of the UNRRA, an international social welfare program that distributed aid to nations affected by World War II.  CIC asserts that it is not liable to Cosmopolitan because Cosmopolitan has not sustained its burden of proving the existence and terms of any CIC policy that would provide Cosmopolitan coverage for the underlying asbestos claims.

## II.      PROCEDURAL HISTORY & EVIDENTIARY HEARING

The Third Amended Complaint is the operative complaint.  The remaining claims are against CIC only.  Cosmopolitan alleges that pursuant to the terms of Policy C-4893, CIC is obligated to defend and indemnify Cosmopolitan in connection with the underlying asbestos

claims.  The parties agreed that the case is not to be tried by a jury and that an evidentiary hearing would be held to determine the threshold question of whether CIC issued any policies covering Cosmopolitan regarding the asbestos plaintiffs, and if so, the terms of such policies.

Due to the COVID-19 pandemic, the evidentiary hearing was held via video conference on August 25 and September 2, 2020.  Pursuant to the Court's directive, direct testimony was submitted in writing, and the witnesses were cross-examined live at the hearing. Cosmopolitan called one expert and two lay witnesses:

- Alan Jervis, Cosmopolitan's expert witness, offered his opinion that vessels chartered by Cosmopolitan during the Relevant Time Period for relief efforts on behalf of the UNRRA and on which the asbestos plaintiffs sailed were afforded P&I coverage on a policy issued by CIC to the UNRRA, and that the terms and conditions of this policy are contained in other P&I policies issued by CIC around the Relevant Time Period.

- Kevin G. O'Donovan, the attorney who served as Cosmopolitan's defense counsel in the forty-seven underlying asbestos cases, laid the foundation for documents that link each of the forty-seven asbestos plaintiffs to a Cosmopolitan chartered ship.

- Phillip Russell Manheimer testified on behalf of the Fulton Syndicate, a syndicate of insurance companies (not including CIC) that wrote P&I policies during the Relevant Time Period.  He testified, inter alia, that a search of available Fulton Syndicate P&I policies uncovered no evidence of any such policies that covered Cosmopolitan or its vessels; and that the U.S. Maritime Commission permitted only four insurance entities -- CIC, the Fulton Syndicate, Fireman's Fund and the American Steamship Owners Mutual -- to provide P&I coverage for U.S. government-chartered vessels during the Relevant Time Period.

The Court admitted into evidence 129 Plaintiff's exhibits and permitted Plaintiff's expert, Mr. Jervis, to rely on and reference six exhibits not in evidence pursuant to Federal Rule of Evidence 703.

CIC called one witness, an expert, Thomas Prendergast, who provided testimony to rebut Cosmopolitan's expert and opined in substance that there is no evidence that CIC ever provided P&I insurance to Cosmopolitan during the Relevant Time Period. The Court admitted thirty-one Defendant's exhibits.

After the evidentiary hearing and pursuant to the Court's order, Cosmopolitan filed supplemental materials, including a chart comparing policy terms for other P&I insurance policies. Cosmopolitan also filed three affidavits -- by Granville T. Conway, Tyler Goodmanson and Mr. O'Donovan (a witness described above) -- to establish Cosmopolitan's diligent but unsuccessful search for relevant insurance policies. CIC responded, including with its own version of the chart.

## III.   CONSIDERATION OF "SECONDARY EVIDENCE" AND STANDARD OF PROOF

### A.   Diligent Search

Cosmopolitan seeks to establish insurance coverage by relying on secondary evidence to show the existence and terms of a policy that, except for three endorsements, cannot be found. Cosmopolitan's search for the policy was sufficiently diligent that it may rely on secondary evidence. This issue is somewhat academic because, as explained below, the secondary evidence that Cosmopolitan has marshaled is insufficient to show material terms of Policy C-4893.

Under New York law,[1] an insured may rely on secondary evidence (i.e., evidence other than the policy itself) to prove the existence and terms of an insurance policy only after the insured demonstrates that it has made a "diligent but unsuccessful search and inquiry for the missing [policy]." *Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*, 302 F.3d 83, 91 (2d Cir. 2002); *accord Danaher Corp. v. Travelers Indem. Co.*, 414 F. Supp. 3d 436, 461 (S.D.N.Y. 2019), *leave to appeal denied,* No. 10 Civ. 121, 2020 WL 6712193 (S.D.N.Y. Nov. 16, 2020). The diligence requirement stems from the "best evidence" rule codified in Rule 1004 of the Federal Rules of Evidence and is a preliminary question concerning the admissibility of evidence that is to be determined by the Court. *Burt Rigid Box, Inc.*, 302 F.3d at 91-92. Secondary evidence of the contents of an unproduced original may be admitted under the best evidence rule if loss of the original is established, and loss "may be established upon a showing of a diligent search in the location where the document was last known to have been kept." *Schozer v. William Penn Life Ins. Co. of New York*, 644 N.E.2d 1353, 1355 (N.Y. 1994); *accord Mutlu v. Mutlu*, 115 N.Y.S.3d 339, 341 (2d Dep't 2019).

Cosmopolitan conducted a diligent search of its own records as well as third-party records. Cosmopolitan commenced an investigation for the relevant policies in 1995, asking its former insurance broker to search for policies from the Relevant Time Period, but none were found. Nearly a decade later and after Cosmopolitan had ceased operations, Cosmopolitan searched its own internal records for insurance policies, including any policies issued to the UNRRA, and found no relevant insurance policies. In late 2016, around the time of settlement

---

[1] As the parties rely on New York law, the Court applies New York law. *See Alphonse Hotel Corp. v. Tran*, 828 F.3d 146, 152 (2d Cir. 2016) ("The parties' briefs assume that New York law controls, and such implied consent . . . is sufficient to establish choice of law." (internal quotation marks and citations omitted)).

discussions with the asbestos plaintiffs, Cosmopolitan issued subpoenas to four entities that might have provided P&I coverage for its vessels -- CIC, the Fulton Syndicate, the American Club, and the Fireman's Fund.  These subpoenas turned up no relevant insurance policy. Cosmopolitan searched various archives for insurance policies issued to Cosmopolitan and the UNRRA, and found documents that are now in evidence, including the three endorsements to Policy C-4893 discussed below.  The United Nations Archives is the location where the originals of these three endorsements were last known to have been kept.  After finding these endorsements, Cosmopolitan again searched the archives -- including the United Nations Archives, UNRRA records at the Columbia Rare Book and Manuscript Library, and the National Archives -- but did not find the initial Policy C-4893.

This search was sufficiently diligent, particularly since this is not a traditional lost policy case, where the entirety of the policy cannot be found and even its existence is in doubt.  Here, Cosmopolitan seeks coverage under an identified policy, parts of which have been found, namely the three endorsements to Policy C-4893.  The issue here is whether Cosmopolitan may rely on secondary evidence to prove what is missing from those endorsements and what would have been included in the original policy and any other endorsements applicable during the Relevant Time Period.  This turns on the question of whether Cosmopolitan conducted a diligent search for those remaining portions of Policy C-4893.

Cosmopolitan did conduct a diligent but unsuccessful search for the remainder of Policy C-4893 by looking in the locations where it would mostly likely be found, among the records of the insured (the UNRRA) and the insurer (CIC).  The UNRRA no longer exists, but Cosmopolitan searched document archives containing or likely to contain its papers, including the archive where the originals of three endorsements to Policy C-4893 were last known to have

been kept.  *See Schozer*, 644 N.E.2d at 1355 (noting that loss "may be established upon a showing of a diligent search in the location where the document was last known to have been kept").  Cosmopolitan also sent an initial subpoena to CIC, and after this suit was commenced, the parties engaged in extensive discovery.

CIC argues that Cosmopolitan's policy search was insufficiently diligent for several reasons including that Cosmopolitan has not accurately detailed the specifics of each search; Cosmopolitan did not search for responsive insurance policies until 1995 even though the underlying asbestos litigation started in the 1980s; Cosmopolitan did not issue subpoenas to possible foreign insurers; Cosmopolitan did not ask the four subpoenaed insurers to search for policies issued to the UNRRA.  But these criticisms do not counter the fact that the missing portions of Policy C-4893 could not be found in the United Nations Archive (their most likely location since the three endorsements to Policy C-4893 were located there), nor in any of the other archives where the UNRRA's documents were likely to be found.  As the policy was issued by CIC to the UNRRA, Cosmopolitan's inquiries and searches of other entities that were not parties to the policy are less critical.  Accordingly, the decision below looks to secondary (i.e., circumstantial) evidence to supply missing terms and provisions of Policy C-4893.

**B.    Burden of Proof**

When a party seeks coverage in a "lost policy" case, New York law is unclear as to whether that party must prove the existence and terms of the lost policy by a preponderance of the evidence or by clear and convincing evidence.  *Burt Rigid Box, Inc.*, 302 F.3d at 91 (declining to decide which standard applies under New York law because the purported insured met either standard); *Danaher Corp.*, 414 F. Supp. 3d at 461 (same); *see also Gold Fields Am. Corp v. Aetna Cas. & Sur. Co.*, 661 N.Y.S.2d 948, 949-51 (Sup. Ct. 1997) (holding plaintiff to

the preponderance of the evidence standard); *see generally Bayway Ref. Co. v. Oxygenated Mktg. & Trading A.G.*, 215 F.3d 219, 223 (2d Cir. 2000) (as a federal court sitting in diversity, applying the forum state's law rather than federal law under the *Erie* doctrine to determine burden of proof).

It is unnecessary to decide which standard of proof applies in this case because, as explained below, even though Cosmopolitan has proven by clear and convincing evidence that CIC provided insurance under Policy C-4893 to the UNRRA, Cosmopolitan has failed to prove even by preponderance of the evidence the terms of Policy C-4893.

## IV.    FINDINGS OF FACT

### A.  CIC Provided Exclusive P&I Coverage for Vessels Sailing on Behalf of the UNRRA

Before reaching the question of whether Cosmopolitan was covered by Policy C-4893, the parties dispute whether CIC issued P&I insurance to the UNRRA and, if so, the period of coverage, and whether other insurers also provided the UNRRA with P&I coverage.  The record shows by clear and convincing evidence that CIC was the only insurer that provided P&I coverage to the UNRRA, from at least May 1946 to August 1947, and did so under Policy C-4893.

#### 1.  CIC issued Open Cover P&I Policy C-4893 to the UNRAA.

Several items of evidence show that CIC issued Policy C-4893 to the UNRRA.  First, an endorsement dated April 23, 1947, (the "April 23 Endorsement") states that it should be "attached to and made part of Policy C-4893 of the CONTINENTAL INSURANCE COMPANY" and "issued to" the UNRRA.  The April 23 Endorsement extends coverage of Policy C-4893 from "April 23, 1947, Noon, Eastern Standard Time to August 1, 1947, Midnight, Eastern Standard Time."  Finally, Johnson & Higgins is listed as the insurance broker, and the

evidence shows that it consistently managed communications between CIC and the UNRRA regarding premium payments, policy extensions, and other matters.  Second, two other endorsements, dated November 18, 1946 (the "November 18 Endorsement"), and April 30, 1947 (the "April 30 Endorsement"), respectively, confirm that CIC issued Policy C-4893 to the UNRRA.

The endorsements specify that the insurance is open cover P&I.  The parties do not dispute that P&I coverage is marine liability insurance against "loss, damage or expense arising out of, or incident to, the ownership, operation, chartering, maintenance, use, repair, or construction of any vessel, craft or instrumentality in use in ocean or inland waterway, including liability of the insured for personal injury, illness or death . . . ."  N.Y. Ins. Law § 1113(21) (McKinney 2017); *accord* Steven Plitt et al., *Couch on Insurance* § 137:8 n.2 (3d ed. 1995).

That the policy was "open cover" means, as Mr. Jervis explained it, that "cover is offered automatically to the insured for the period contemplated by the policy."  Such a policy would allow several different operators of vessels (e.g. Cosmopolitan) to be automatically covered when a vessel "comes on the risk" without needing to insure each vessel by name or separately every time a new one is added to an initiative.  Mr. Prendergast attempted to cast doubt on Mr. Jervis's definition of "open cover" by stating that he has never encountered an "open" P&I policy.  Nevertheless, Mr. Jervis's definition of "open cover" is accepted as it is consistent with what appears to be the common definition of the term in the industry, appears reasonable under the circumstances, and Mr. Prendergast did not offer an alternative definition.  *See, e.g.*, Eric M. Holmes, *Appleman on Insurance* § 196.05(G) (2d ed. 1996) ("An open policy of marine insurance covers all shipments to be made while the policy remains in force."); *Amalgament Inc. v. Underwriters at Lloyd's Under Policy Nos. K3PS91031/V01*, 724 F. Supp. 1132, 1134

9

(S.D.N.Y. 1989) ("[A] permanent cargo open cover policy . . . automatically covered all cargoes shipped during the policy's effective period.")

   **2.  The Term of P&I Policy C-4893 was at least from May 1946 to August 1, 1947**.

   The three endorsements, which are a part of Policy C-4893, show coverage from at least May 1946 to August 1, 1947.  *See Couch on Insurance* § 21:21 ("Endorsements . . . are a part of the contract of insurance and are to be read and construed with the policy proper."). Cosmopolitan has not sustained its burden of showing that Policy C-4893 covered any earlier or later period.

   The November 18 Endorsement states the premium amount for a list of covered ships that sailed between May 1946 and September 1946.  The April 30 Endorsement lists the premium amount for a list of covered ships that sailed between October 1946 and April 1947.  The November 18 and April 30 Endorsements are consistent with the definition of "open cover" accepted above -- i.e., vessels that sailed on behalf of the UNRAA *during the coverage period* are automatically covered by the policy without being separately scheduled for coverage in advance; covered vessels are listed in these two endorsements and the precise dollar amount of premium is fixed after the vessels have sailed.  Finally, the April 23 Endorsement extends coverage of Policy C-4893 from April 23, 1947, to August 1, 1947.

   CIC argues that the only coverage period supported by the evidence is from April 23, 1947, to August 1, 1947, the coverage period expressly stated in the April 23 Endorsement. While this is the only direct evidence of the coverage period, the other two endorsements are strong secondary evidence of coverage that preceded the April 23 Endorsement.

   Cosmopolitan argues that a letter dated December 15, 1948, ("December Letter") between the Administrator for Liquidation for the UNRRA and the Treasurer for Cosmopolitan

indicates that Policy C-4893 extended beyond August 1, 1947.  Cosmopolitan further argues that the December Letter references the S.S. WILLIAM LYON PHELPS, a Cosmopolitan chartered ship that is referenced in several other Plaintiff's Exhibits that connect it to the UNRRA. However, while the December Letter references four Cosmopolitan chartered vessels including the S.S. WILLIAM LYON PHELPS and when those vessels sailed, it does not contain any information about any insurance for those vessels, a fact Cosmopolitan concedes.  The December Letter is evidence of a continuing relationship between Cosmopolitan and the UNRRA.  It is not evidence that the UNRRA renewed Policy C-4893 after August 1, 1947, and Cosmopolitan has not produced any evidence to suggest otherwise.

### 3.  CIC was the Sole Provider of P&I Insurance to the UNRRA beginning May 1, 1946.

The evidence shows that CIC was the only provider of P&I insurance for the UNRRA beginning on May 1, 1946.  Mr. Manheimer credibly testified that only four domestic insurance carriers, including CIC, were writing P&I insurance during this period.  A document dated November 22, 1946, from the UNRAA's broker, Johnson & Higgins, to the UNRRA, references "One American Policy" providing P&I coverage for "all vessels coming at risk on and after May 1st, 1946," as well as "Five American Policies" providing other coverage not relevant here. Nothing else in the record suggests that additional policies or insurers provided P&I insurance to the UNRRA during the Relevant Time Period.  Only one American policy providing P&I coverage to the UNRRA during this period is referenced in the record, and that is Policy C-4893 issued by CIC, as reflected in the three endorsements.

CIC points to evidence that the P&I insurance market during the Relevant Time Period included foreign insurers.  While that may be true, the November 22 document referenced in the preceding paragraph can fairly be read to state that P&I coverage was provided to the UNRAA

by one American insurer and not any foreign insurer, and the Policy C-4893 endorsements reveal that insurer to be CIC.

### B. Coverage of the Underlying Asbestos Claims

Cosmopolitan has satisfied its burden to show that five of its ships sailed for the UNRRA and that the UNRRA decided to procure P&I insurance for its operating agents.

### 1. Cosmopolitan Chartered Ships on Behalf of the UNRRA, including Five Ships that are Named.

Cosmopolitan has shown that it was an applicant to provide bareboat charters for the UNRRA and that it subsequently chartered some ships for the UNRRA.  First, in a document titled "APPLICATION TO CHARTER" dated September 14, 1945, (the "Charter Application") Cosmopolitan submitted an application to the UNRRA to charter thirteen vessels.  The same document states, "[Cosmopolitan] owns no vessels.  The vessels it presently has under Interim Bareboat Charter under [two contracts] are now engaged in the carriage of live animals for [the UNRRA] and bulk cargoes for other interests."  The document shows that before the Relevant Time Period, Cosmopolitan provided bareboat charters for "other interests" as well as the UNRRA and applied to continue providing these services for the UNRRA during the Relevant Time Period.  Similarly, Cosmopolitan was listed as a proposed applicant "FOR CHARTER OF CATTLE FITTED VESSELS" on May 13, 1946.

In a document titled "ADDENDUM NO. 2" and dated November 5, 1946, (the "Addendum"), the President of Cosmopolitan and the Deputy Director of the UNRRA signed an agreement, amending their prior agreement, the "Charter Party dated at New York, August 23, 1946, between Cosmopolitan . . . Bareboat Chartered Owners of the American S.S. 'CARROLL VICTORY' and [the UNRRA]."  The Addendum changes the lump sum freight dollar amount

for the vessel's next voyage from the amount provided in the Charter Party.  This document shows that Cosmopolitan chartered the S.S. CARROLL VICTORY on behalf of the UNRRA.

Finally, in the December Letter discussed above, Cosmopolitan seeks "to settle completely all of our transactions with you [the UNRRA], including all dry cargo contracts as well as all animal carrier contracts for all vessels and all voyages . . . ."   The letter states that the settlement amount includes sums due to the UNRRA on "various coal and grain shipments carried for [the UNRRA] on several of our dry cargo vessels," namely the S.S. JOAQUIN MILLER (August 13, 1948), S.S. MICHAEL MORAN (Jan. 7, 1948), S.S. WM. L. PHELPS (January 9, 1948) and S.S. THOS. W. MURRAY (November 17, 1948).  This document shows that Cosmopolitan chartered the four named ships as well as other unidentified ships on behalf of the UNRRA.

CIC makes several arguments disputing that the documents support Cosmopolitan's claims for coverage.  First, CIC notes that the fact that Cosmopolitan was an applicant to the UNRRA does not establish that Cosmopolitan entered into a final bareboat charter agreement.  The Charter Application also states that Cosmopolitan had carried "bulk cargoes for other interests."  Second, CIC argues that the Addendum does not indicate actual dates of service or the identity of insurers who may have provided P&I coverage.  Finally, CIC asserts that the December 1948 Letter makes no reference to CIC or insurance coverage.  CIC's arguments fail to dispute the central fact shown by these exhibits -- that Cosmopolitan applied to, and eventually did, charter vessels on behalf of the UNRRA, including five vessels that are named.

**2.  The UNRAA Provided Insurance for the Vessels Operating on Its Behalf.**

The evidence shows that the UNRRA procured insurance for the vessels operating on its behalf.  In an internal UNRRA memorandum, dated May 10, 1946, regarding "Operating

Agreement for Cattle Fitted Vessels," Richard Turner advised Harry Lamberton, "[I]t is the opinion of this office that it would be preferable for UNRRA to procure the necessary insurance for its own and the Operating Agents protection rather than provide for this insurance being obtained by the Operating Agents." In a letter dated May 21, 1946, Mr. Lamberton passed on this advice to Alfred Davidson stating, "The insurance section would prefer to have UNRRA take out the insurance rather than the agents, since UNRRA, under the contract, undertakes to save harmless the operating agents from any loss arising from inadequate insurance . . . . I am inclined to agree with the insurance section." Mr. Davidson responded on May 23, 1946, that he is "agreeable to direct purchase of the insurance by UNRRA." That the UNRRA procured insurance for all vessels operating on its behalf is also consistent with the "open cover" nature of Policy C-4893 issued to the UNRRA; the November 18 and April 30 Endorsements listing covered vessels after their respective sailing dates; and the November 22, 1946, broker document to the UNRRA discussed above, which references "One American Policy" providing P&I coverage for "all vessels coming at risk on and after May 1st, 1946."

### 3. The Evidence Credibly Links the Forty-Seven Asbestos Plaintiffs and the Cosmopolitan Vessels on Which They Sailed.

Cosmopolitan has sustained its burden of showing that the forty-seven asbestos plaintiffs sailed on Cosmopolitan chartered ships. The evidence consists of forty-seven annotated vessel status cards, one for each plaintiff, and the credible testimony of Mr. O'Donovan. The vessel status cards (except for one notation described below) are maintained by the Maritime Administration and its predecessor agencies ("MARAD") and are available at the MARAD website. Each card describes one vessel and its operators and their dates of operation over the life of the ship.

The forty-seven cards in evidence were obtained by Mr. O'Donovan during the asbestos litigation, and each one includes a handwritten notation with the last name of one asbestos plaintiff who served on the referenced vessel during the period it was chartered by Cosmopolitan.  Mr. O'Donovan testified that plaintiff's counsel in the asbestos litigation made the notation linking a plaintiff with a vessel status card.  He credibly testified that, during the asbestos litigation, he and his paralegal confirmed that the plaintiff and vessel were correctly linked by cross-referencing the information with Coast Guard certificates that show that the plaintiff worked on a particular ship and that the ship was being operated by Cosmopolitan at the time.  In one instance, they found that a plaintiff had been linked with a Cosmopolitan ship in error, and plaintiffs' counsel agreed to drop that case.  In other instances, they found that the charter had taken place under an agreement that placed liability on the government rather than Cosmopolitan, and plaintiffs' counsel agreed to drop those cases as well.

The vessel cards and Mr. O'Donovan's testimony linking the forty-seven asbestos plaintiffs with Cosmopolitan chartered ships were properly admitted into evidence.  The vessel cards without the notation are public records of MARAD's activities and are available and subject to verification on the MARAD website.  *See* Fed. R. Evid. 803(8).  CIC has not argued that the information on the cards is untrustworthy or inaccurate.  The cards are also admissible under the residual exception to the hearsay rule, as are the notations on them linking plaintiffs and vessels.  *See* Fed. R. Evid. 807.  The notations are supported by sufficient guarantees of trustworthiness in that they were made by counsel during the course of litigation, subject to confirmation by opposing counsel (Mr. O'Donovan) whose client's interest (Cosmopolitan's interest as defendant) was to narrow the list to reduce liability, and who successfully identified errors that eliminated certain plaintiffs and their claims against Cosmopolitan.  The notations

appear to be not only the best evidence, but also the only readily available evidence, of which asbestos plaintiffs sailed on which Cosmopolitan chartered ships and when, and CIC has not suggested otherwise.  CIC had ample notice before the hearing of Cosmopolitan's intention to rely on the annotated vessel cards as they were identified on a joint exhibit list filed with the Court in January 2020, seven months before the hearing, and CIC deposed Mr. O'Donovan about them in March 2020.

Contrary to CIC's arguments, it is immaterial that the underlying asbestos claims were settled before the information in the cards could be tested by full discovery or motion practice, and it is incorrect that the information is self-serving as the annotations were made by Cosmopolitan's adversary in the underlying asbestos litigation to establish Cosmopolitan's liability.  Mr. O'Donovan's testimony was credible in light of his demeanor and his straightforward responses to questions on cross-examination.  CIC has not provided any reason that would cause the Court to doubt Mr. O'Donovan's credibility or the information on the vessel cards.

### 4. Cosmopolitan Has Shown that Four of the Asbestos Plaintiffs Sailed on Cosmopolitan Chartered Ships Operating for the UNRRA.

Cosmopolitan has met its burden of showing by clear and convincing evidence that four of the forty-seven asbestos plaintiffs sailed on Cosmopolitan chartered ships operating for the UNRRA.  As explained above, the evidence identifies five Cosmopolitan vessels that sailed for the UNRRA -- (1) S.S. CARROLL VICTORY, (2) S.S. JOAQUIN MILLER, (3) S.S. MICHAEL MORAN, (4) S.S. WILLIAM LYON PHELPS and (5) S.S. THOS. W. MURRAY. Based on the information in the vessel cards, the following asbestos plaintiffs sailed on one of these five vessels listed above between May 1946 and August 1947: John P. Orchard, Leroy Kimbrough, Pearl E. Wafer and Howard Wyman.

- John P. Orchard served aboard the S.S. CARROLL VICTORY from September 25, 1946, through October 28, 1946.

- Leroy Kimbrough served aboard the S.S. WILLIAM LYON PHELPS from June 7, 1946, through December 5, 1946.

- Pearl E. Wafer served aboard the S.S. WILLIAM LYON PHELPS from April 28, 1947, through June 22, 1947.

- Howard Wyman served aboard the S.S. THOMAS W. MURRAY from February 13, 1947, through April 9, 1947.

Cosmopolitan claims that all twenty-two of the Cosmopolitan vessels, carrying the asbestos plaintiffs, were chartered by the UNRRA because they all sailed for Cosmopolitan only during the period it was sailing for the UNRRA, not before or after. Cosmopolitan further notes that the Charter Application lists thirteen vessels. Finally, Cosmopolitan draws attention to the S.S. WILLIAM LYON PHELPS and argues that, since the S.S. WILLIAM LYON PHELPS is referenced in multiple letters that connect it to the UNRRA over the course of the Relevant Time Period, including the Charter Application and the December Letter, the other vessels also were chartered by the UNRRA. Cosmopolitan's arguments are unpersuasive. As explained in the Charter Application, the vessels Cosmopolitan had under charter in September 1945 also sailed for "other interests" in addition to the UNRRA, and nothing shows that Cosmopolitan abandoned these other interests to sail exclusively for the UNRRA between 1946 and 1948. Simply because Cosmopolitan proposed certain vessels in an application does not show what vessels Cosmopolitan ultimately operated on behalf of the UNRRA. Further, the extensive evidence connecting the S.S. WILLIAM LYON PHELPS to the UNRRA does not shed any light on whether the other Cosmopolitan vessels sailed for the UNRRA. Cosmopolitan has failed to

prove even by a preponderance of the evidence that any Cosmopolitan vessel, other than the five

listed above, sailed on behalf of the UNRRA.

### C.  Terms and Conditions of Coverage of Policy C-4893

Although Cosmopolitan has shown that Policy C-4893 covered at least some of the

asbestos plaintiffs who worked on Cosmopolitan chartered vessels that sailed for the UNRRA,

Cosmopolitan has not shown even by a preponderance of the evidence the material terms of

Policy C-4893.  Most critical among the missing terms is that the evidence does not show how

much insurance CIC contracted to provide – i.e., any policy, per vessel or per occurrence "limit."

Therefore, the policy is unenforceable.

"To create a binding contract, there must be a manifestation of mutual assent sufficiently

definite to assure that the parties are truly in agreement with respect to *all material terms*."

*Express Indus. & Terminal Corp. v. New York State Dep't of Transp.*, 715 N.E.2d 1050, 1053

(N.Y. 1999) (emphasis added); *accord Starke v. SquareTrade, Inc.*, 913 F.3d 279, 289 (2d Cir.

2019).  "[A] court cannot enforce a contract unless it is able to determine what in fact the parties

agreed to."  *166 Mamaroneck Ave. Corp. v. 151 E. Post Rd. Corp.*, 575 N.E.2d 104 (N.Y. 1991);

*accord Morelli v. Alters*, No. 19 Civ. 10707, 2020 WL 1285513, at *9 (S.D.N.Y. Mar. 18, 2020).

In a lost policy case, courts have found terms to be established by clear and convincing evidence

where a "typical" policy was available to provide evidence of agreed upon terms.  *See Burt Rigid*

*Box, Inc.*, 302 F.3d at 93-94 ("With respect to the *terms* of the CGL policies, the parties agreed

that any CGL policy issued by Aetna to Moore between 1963 and 1971 would have been its

'standard' or 'typical' policy.").  In *Danaher*, the district court concluded that the terms of a lost

policy are established by clear and convincing evidence where the unavailable policies are

renewal policies because the renewal is presumed to adopt the terms of the existing policy.  *See*

*Danaher*, 414 F.Supp.3d at 464 (applying New York law).  In *Glew v. Cigna Grp. Ins.*, the district court found that the terms of a lost policy had been established by a preponderance of the evidence where a witness, who was familiar with the terms of the lost policy, testified that another policy, in evidence, had the same terms and conditions as the lost policy.  590 F. Supp. 2d 395, 414 (E.D.N.Y. 2008).  By contrast, where evidence of a policy's terms is conflicting or contradictory, the plaintiff will fail to satisfy even a preponderance of the evidence standard.  *See Bandler v. BPCM NYC, Ltd.*, No. 12 Civ. 3512, 2014 WL 5038407, at \*10 (S.D.N.Y. Sept. 29, 2014), *aff'd sub nom. Michael Bandler, MB & Co. v. BPCM NYC, Ltd.*, 631 Fed. App'x 71 (2d Cir. 2016).

Cosmopolitan submitted as exhibits two forms of insurance policy as examples of maritime insurance policies issued around the coverage period, arguing that they reflect the terms in Policy C-4893.  The first is P&I No. C 3601 ("Policy 3601"), a commercial policy that CIC issued to the America France Line of Cosmopolitan for the period June 30, 1938, to June 30, 1939.  The second is a WARTIMEPANDI POLICY, for which Cosmopolitan submitted five examples, issued by a consortium of insurers including CIC, which insured the United States of America, acting through its Administrator, the War Shipping Administration. WARTIMEPANDI POLICY No. 195533 ("Policy 195533") is one of the WARTIMEPANDI policies and is representative of them.  The policy period for Policy 195533 was January 1, 1945, to January 1, 1946.  These policies, whether considered independently or together, fail to meet even a preponderance of the evidence standard to prove the terms of Policy C-4893.

Taken together, the policies do not show a consistent adoption of material terms.  Both comparator policies provide P&I coverage.  The similarity in the scope of coverage of Policy 3601 and Policy 195533 is not coincidental as both reflecting the same line of coverage. But

while some terms of these two policies are similar, many of them are inconsistent.  *See Bandler*,
2014 WL 5038407 at *10 (finding the plaintiff failed to satisfy a preponderance of the evidence
standard where an explanation for a policy's terms was shifting or conflicting).  A critical term,
the policy limit, differs between the two policies.  Policy 3601 provides a policy limit of
$500,000 per vessel, while Policy 195533 provides a policy limit of $500,000 per vessel per
accident.  The time limitation is another important provision, which may be at issue in this case.
Policy 3601 has a time limitation for reporting claims of six months after the insured has made
payment, while Policy 195533 has a time limitation for filing suit against the insurer of 24
months after the loss, damage or payment.  The premium provisions also differ.  Policy 3601
states a premium of 32.5 cents per gross ton.  Policy 195533 does not appear to state the
premium amount in the pages submitted as an exhibit.  Regardless of what other terms may be
similar, the two comparator policies do nothing to resolve what these differing provisions might
have been in Policy C-4893.

Neither comparator policy provides any direct connection to Policy C-4893, the missing
policy in question.  Unlike in *Danaher*, 414 F. Supp. 3d at 464*,* or in *Glew*, 590 F. Supp. 2d at
414, Policy C-4893 was not a renewal policy and no witness testified that he was personally
familiar with the terms of Policy C-4893.  Any insight the comparator policies might provide
would require some basis to conclude that a policy issued by CIC to the UNRAA, like Policy C-
4893, would have contained similar terms, but that evidence is lacking.  Policy 3601 was issued
by CIC to Cosmopolitan, not the UNRRA, nearly a decade before the Relevant Time Period.  It
may be useful as an exemplar of a commercial policy issued by CIC around that time.  But there
is no evidence that CIC would have viewed the policy issued to the UNRRA as a typical
commercial policy.  Conversely, Policy 195533 was a WARTIMEPANDI policy, insuring the

United States of America and issued by a consortium of seven insurance companies, only one of which was CIC.  With four similar examples, Policy 195533 is useful to show the terms of a WARTIMEPANDI policy issued by the consortium.  But again, there is no evidence that CIC and the UNRRA would have borrowed the terms of such a policy, rather than a CIC policy or any other policy.  While Policy 3601 may have been a standard CIC commercial P&I policy, and Policy 195533 was likely a standard WARTIMEPANDI policy, the missing policy here was neither of these.

The evidence suggests that Policy C-4893 was not a policy that defaulted to boilerplate language.  Mr. Prendergast credibly testified that he had never in "forty plus years in marine insurance . . . encountered an 'open' P&I policy."  Although Policy 195533 appears by its terms to be an open cover policy, under the circumstances as a government wartime policy, its terms also may have been sui generis.  Based on the evidence, Cosmopolitan has failed to show even by a preponderance of the evidence the material terms of Policy C-4893.

Cosmopolitan's expert, Mr. Jervis also stated that he relied on PX 133, a Standard Form SP-23 P&I insurance policy ("Policy SP-23") published by the American Institute of Marine Underwriters in 1956, to further his opinions related to the possible terms and conditions of Policy C-4893.  Although this form was published roughly ten years after the missing policy in this case was issued, Policy SP-23 may be relevant as CIC's expert Mr. Prendergast credibly testified that the marine business evolves at a "glacial pace" and the "wordings [of policies] would probably be reasonably consistent decade to decade."  Nevertheless, even if Policy SP-23 had been admitted into evidence, it does not provide the necessary missing material terms lacking from Policy C-4893.  Because it is a form policy, certain important terms are left blank for the parties to negotiate.  The most obvious example is that Policy SP-23 leaves blank the

amount of insurance purchased and the cost (i.e., the "limit" and the premium) to be filled in by the parties.  Like the other policies Cosmopolitan submitted, Policy SP-23 does not satisfy Cosmopolitan's burden of proving the material terms of the missing policy.  On a practical level, without knowing the policy limits, it is unclear how one would proceed in deciding how much insurance is available to Cosmopolitan for each eligible asbestos plaintiff under Policy C-4893.

## V.      CONCLUSION

In summary, the Court makes the following findings based on the evidence in the record:

(1) CIC was the only insurer to issue P&I coverage to the UNRRA for the period between May 1946 and August 1947.

(2) Policy C-4893 covered ships that Cosmopolitan chartered on behalf of the UNRRA; those identified are the S.S. CARROLL VICTORY, the S.S. JOAQUIN MILLER, the S.S. MICHAEL MORAN, the S.S. WILLIAM LYON PHELPS, and the S.S. THOS. W. MURRAY.

(3) Cosmopolitan has failed to establish all material terms of Policy C-4893.

For the reasons stated above, the Court DECLARES that Cosmopolitan has not established the terms of Policy C-4893 by preponderance of the evidence, and CIC cannot be found to afford coverage to Cosmopolitan for the underlying asbestos claim.

SO ORDERED.

Dated: January 22, 2021
        New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE